*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0047p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

ASHLAND HOSPITAL CORPORATION, d/b/a
King's Daughters Medical Center,
  *Plaintiff-Appellant*,

  *v.*

SERVICE EMPLOYEES INTERNATIONAL UNION,
DISTRICT 1199 WV/KY/OH,
  *Defendant-Appellee*.

No. 11-6006

Appeal from the United States District Court
for the Eastern District of Kentucky at Ashland.
No. 0:10-cv-131—David L. Bunning, District Judge.

Argued: October 3, 2012

Decided and Filed: February 21, 2013

Before: MOORE and COLE, Circuit Judges; ROSE, District Judge.[*]

───────────────

## COUNSEL

**ARGUED:** W. Mitchell Hall, Jr., VANANTWERP, MONGE, JONES, EDWARDS & McCANN, LLP, Ashland, Kentucky, for Appellant. Benjamin S. Basil, PRIDDY, CUTLER, MILLER & MEADE PLLC, Louisville, Kentucky, for Appellee. **ON BRIEF:** W. Mitchell Hall, Jr., Leigh Gross Latherow, Christina D. Dajjar, VANANTWERP, MONGE, JONES, EDWARDS & McCANN, LLP, Ashland, Kentucky, for Appellant. Don Meade, PRIDDY, CUTLER, MILLER & MEADE PLLC, Louisville, Kentucky, for Appellee.

COLE, J., delivered the opinion of the court, in which MOORE, J., joined. ROSE, D. J. (pp. 13–16), delivered a separate dissenting opinion.

───────────────

[*] The Honorable Thomas M. Rose, United States District Judge for the Southern District of Ohio, sitting by designation.

---

**OPINION**

---

COLE, Circuit Judge.   This case turns on the reach of two provisions of the Telephone Consumer Protection Act of 1991 ("TCPA" or "Act"), 47 U.S.C. § 227.  The Act bans certain abuses of telephone technology that threaten the privacy of our homes and businesses.  Ashland Hospital Corporation, doing business as King's Daughters Medical Center ("KDMC"), brought suit against the Service Employees International Union ("SEIU"), District 1199 WV/KY/OH, to enjoin an automated "robo-call" campaign that contacted private residents in their homes with a prerecorded message offering to help connect them to KDMC to express concerns over the treatment of hospital employees.  The campaign resulted in hundreds of live calls to hospital lines. The question for decision is whether these factual allegations state a plausible claim for relief under the TCPA.  In particular, we must decide whether the allegations show that the SEIU "ma[de] any call" to emergency lines or "use[d] an automatic telephone dialing system in such a way that two or more" hospital lines were engaged simultaneously within the meaning of the Act.  Because we conclude that they do not, we affirm.

I.

This case grew out of a labor dispute between the parties.  KDMC is a not-for-profit corporation that owns and operates a regional medical center, including a hospital facility, in Ashland, Kentucky.  The SEIU is a labor union that represents thousands of health care and social service workers throughout West Virginia, Kentucky, and Ohio. Some of these workers are employed at KDMC, and the parties have entered into a collective bargaining agreement as a result.

In December 2010, the SEIU expressed concerns regarding the cost of health care for KDMC employees.  The dispute quickly came to a head when the SEIU launched a two-day robo-call campaign targeting KDMC.  The purpose of the campaign was to publicly protest proposed management decisions that would shift a larger cost burden

onto employees.  Residents within KDMC's service area received calls from an automated system that played a prerecorded voice message criticizing KDMC's plans in dramatic terms.  The campaign specifically targeted KDMC CEO Fred Jackson:

> Imagine you're at the hospital alone in pain waiting to be seen; waiting and waiting.  What could possibly be taking so long?  King's Daughters Medical Center CEO Fred Jackson laid off over 100 hospital employees, paid hospital executives bonuses worth over one million dollars, and took over 1.1 million in salary and other perks for himself.  Now Jackson plans to cut health care for hospital employees.  That's just not right.  Press "1" now to call CEO Fred Jackson and tell him to stop putting our families' health care at risk.

The message did not disclose that the SEIU was responsible for the call.  Residents who elected to press "1" were patched through to Jackson's direct extension at KDMC.  The call logs at KDMC indicated that each of the patched-through calls originated from a single telephone number in or near Columbus, Ohio.

As a consequence of the robo-call campaign, KDMC alleges that Jackson's extension received 536 live calls over the two-day period from area residents.  KDMC further alleges that the high volume of incoming calls to Jackson's extension overwhelmed its main trunk lines, which support calls to and from emergency services, patient rooms, and all other extensions within its system.

KDMC responded by commencing this action against the SEIU in the Eastern District of Kentucky to enjoin the campaign.  Based on the above facts, KDMC asserted claims under the TCPA, the Communications Decency Act of 1996, and state tort law, though the latter two claims have since been abandoned.  KDMC identified several supposedly relevant provisions of the TCPA.  In its complaint, KDMC alleged that the SEIU "ma[de] calls using an automatic telephone dialing system" that interfered with the hospital's emergency lines, in violation of § 227(b)(1)(A); and that the SEIU "use[d] an automatic telephone dialing system in such a way" that simultaneously engaged multiple hospital lines, in violation of § 227(b)(1)(D).  In addition, KDMC alleged that the SEIU initiated calls to residential lines using a prerecorded message without prior

express consent, in violation of § 227(b)(1)(B); and that the SEIU failed to comply with identification and disclosure requirements, in violation of § 227(d)(3)(A).

The SEIU moved to dismiss the complaint.  With respect to the TCPA, the SEIU maintained that KDMC had failed to state a claim upon which relief could be granted because the calls made to hospital lines did not fall within the ambit of the Act.  The district court agreed and issued a dismissal pursuant to Rule 12(b)(6).  The court concluded that "the reach of the TCPA is narrowly confined . . . to the perils of automated and prerecorded calls," and does not extend to "purposeful calls made by individuals seeking to express an opinion."  The court believed it decisive that the SEIU's automated system required a real person to "exercise independent judgment" in order to connect to Jackson.  KDMC now appeals, focusing exclusively on § 227(b)(1)(A) and § 227(b)(1)(D).

## II.

We review de novo whether the district court properly dismissed a complaint pursuant to Rule12(b)(6).  *See Logsdon v. Hains*, 492 F.3d 334, 340 (6th Cir. 2007).  At this early stage, our job is simply to test the sufficiency of the complaint on the assumption that all of its factual allegations are true.  *See id.*  We will allow the litigation to proceed if we are satisfied that the allegations state a plausible claim to relief under applicable state or federal law.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).  In the appeal before us, that inquiry turns on the reach of certain provisions of the TCPA, which is a matter of statutory interpretation we also review de novo.  *See Bryant v. Comm'r of Soc. Sec.*, 578 F.3d 443, 445 (6th Cir. 2009).

## A.

The TCPA is a federal statute that regulates the use of telephone technology. Congress enacted the TCPA "to protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home and to facilitate interstate commerce by restricting certain uses of . . . automatic dialers." S. Rep. No. 102-178, at 1 (1991), *reprinted in* 1991 U.S.C.C.A.N. 1968, 1968; *see*

Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (1991) (current version at 47 U.S.C. § 227 (2010)).  The TCPA thus seeks to curb abusive telemarketing practices that threaten the privacy of consumers and businesses.

The TCPA prohibits four practices in particular—subject to a few limited exceptions not relevant here.  Two of these prohibitions are at issue.  First, the TCPA makes it unlawful "to make any call . . . using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any emergency telephone line . . . [or] to the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment . . . ."  47 U.S.C. § 227(b)(1)(A)(i)-(ii).  Second, the TCPA makes it unlawful "to use an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged simultaneously."  *Id.* § 227(b)(1)(D).  Private parties are authorized to seek injunctive relief and statutory damages for violations of these prohibitions.  *See id.* § 227(b)(3).

The general question raised on appeal is just how broadly the prohibitions in § 227(b)(1)(A) and § 227(b)(1)(D) ought to be read.  KDMC argues that the relevant statutory language ought to be read broadly enough to proscribe the conduct it complains of here.  It further argues that a broad reading is consistent with congressional intent and the underlying purposes of the Act.  The SEIU, for its part, admits that it conducted a robo-call campaign aimed at pressuring KDMC's management.  It also admits that KDMC received hundreds of calls as a result.  Nonetheless, the SEIU argues that the TCPA is drawn narrowly enough that it does not regulate calls ultimately made by live persons.  We are left to answer two specific questions in light of the facts alleged in the complaint:  (1) Did the SEIU "make any call . . . to any emergency telephone line" at KDMC during the course of its robo-call campaign within the meaning of § 227(b)(1)(A)?  (2) More generally, did the SEIU "use" its automated system to tie up multiple lines at KDMC in a manner prohibited under § 227(b)(1)(D)?  We answer both questions in the negative.  Seeing no plausible violation of the TCPA, we affirm.

B.

The first question is whether the factual allegations in KDMC's complaint can make out a violation of § 227(b)(1)(A).  This provision prohibits using an automatic telephone dialing system or prerecorded voice message "to make any call . . . to any emergency telephone line," including "any emergency line of a hospital" or "health care facility."  47 U.S.C. § 227(b)(1)(A)(i).  KDMC contends that the SEIU made prohibited calls by connecting certain residents who received the prerecorded message to Jackson's extension at the hospital, the aggregate effect of which was to interfere with its emergency lines.  The district court rejected this view.

Our answer turns on what is meant by the expression "make any call" under § 227(b)(1)(A).  When presented with a matter of statutory interpretation, we begin with the language of the Act itself.  *See United States v. Blanchard*, 618 F.3d 562, 567 (6th Cir. 2010); *United States v. Health Possibilities, P.S.C.*, 207 F.3d 335, 338-39 (6th Cir. 2000); *see also United States v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989).  If the meaning of the Act's language is plain, we give it effect and our analysis comes to an end.  *See Ron Pair*, 489 U.S. at 240-41.  Such is the case here.  While the TCPA does not define "call," that operative term quite naturally suggests some kind of direct communication between two parties—the caller and the caller's intended recipient.  A person is said to "call" whoever is on the other end of the line.  But KDMC does not make factual allegations that the SEIU used its robo-call campaign to communicate directly with Jackson or anyone else at the hospital.  Indeed, if Jackson had answered his telephone at any particular time over the relevant two-day period, he would have heard a live voice on the other end, not a prerecorded message from the SEIU.  Under this common sense approach, the calls actually made to Jackson came from those residents who heard the SEIU's message and elected to press "1" to share their concerns.  It would do violence to the ordinary meaning of "mak[ing] any call" to hold otherwise.

We are not the only ones to read the TCPA this way.  In *Satterfield v. Simon & Schuster, Inc.*, the Ninth Circuit considered "what . . . Congress intend[ed] when it said 'to make any call'" under § 227(b)(1)(A).  569 F.3d 946, 953-54 (9th Cir. 2009)

(addressing the proper classification of text messaging under § 227(b)(1)(A)(iii)). It held that "Congress intended to regulate the use of an [automated system] to communicate or try to get into communication with a person by a telephone." *Id.* at 954. This construction is consistent with the purposes of the Act. *See id.* (noting that Congress was primarily interested in regulating automated calls that invade consumer privacy). Here, the SEIU never actually communicated with KDMC by telephone, nor did it try to do so, as KDMC itself concedes. The complaint ultimately reveals two separate calls in any given interaction: one between the SEIU's automated system and an area resident (to which the TCPA applies), and another between the resident and Jackson (to which the TCPA does not apply).

KDMC sees things differently. In its reply brief, KDMC cites an alternative dictionary definition of the verb "make" that is the equivalent of "cause." KDMC goes on to argue that it is enough that the SEIU's robo-call campaign in some sense caused the disruptive deluge of live calls to Jackson to be made. This construction stretches credulity for obvious reasons. More significantly, it would give rise to far-reaching and unforeseen liability under the narrow prohibition in § 227(b)(1)(A). We therefore decline to adopt it. Instead, we conclude that a reasonable person would understand the expression "make any call" to require some form of direct telephone communication between two parties. Because KDMC has not alleged that it was the recipient of any such communication from the SEIU, it cannot state a claim under § 227(b)(1)(A).

## C.

The next question is whether the factual allegations in KDMC's complaint can make out a violation of § 227(b)(1)(D). This provision prohibits "us[ing] an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged simultaneously." 47 U.S.C. § 227(b)(1)(D). KDMC contends that it is a comparatively broader prohibition because it eschews any sort of "direct contact requirement." Accordingly, KDMC further contends that it is sufficient to allege that the SEIU was the wellspring of all 536 calls that flooded the hospital's lines—even if the torrent was "funneled" through third-party callers. The district court disagreed.

Because this question is more difficult than the last, we must take an especially close look at the factual allegations and the applicable statutory language.

Our answer turns on what it means to "use an automatic telephone dialing system" under § 227(b)(1)(D). This statutory prohibition is no doubt framed in general language. So general, it appears, that we cannot say its meaning is plain. We must therefore rely on other principles of textual interpretation to guide our analysis. One such principle is this: When we are tasked with "interpreting a statute featuring as elastic a word as 'use,'" we should construe the ambiguous "language in its context and in light of the terms surrounding it." *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004) (interpreting portions of the Comprehensive Crime Control Act of 1984). *See generally Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (looking to "the language itself, the specific context in which the language is used, and the broader context of the statute as a whole"). Applying the principle here suggests that context narrows the meaning of the statutory phrase at issue.

We begin with the other three prohibitions enumerated in § 227(b)(1). Each of these regulates first-order contact between automated calls and the unwilling recipients of such calls: § 227(b)(1)(A) regulates "mak[ing] any call" to emergency lines or cell phones; § 227(b)(1)(B) regulates "initiat[ing] any telephone call" to residential lines; and § 227(b)(1)(C) regulates "send[ing] . . . an unsolicited advertisement" to fax machines. Viewed as a whole, these prohibitions indicate that the appropriate touchstone under § 227(b)(1) is the actual receipt of an unwanted automated telephone communication. We must construe the scope of the prohibition in § 227(b)(1)(D) in similar fashion. But the simple fact is KDMC received an overwhelming number of live calls from residents rather than automated calls from the SEIU playing a prerecorded message. While the calls made to residents were the product of a wholly automated process, the subsequent calls made to Jackson were not. Thus, KDMC fails to allege facts showing it was the unwilling recipient of the sort of automated calls regulated under § 227(b)(1)(D) and the TCPA generally.

Our construction has the additional virtue of conforming to Congress's intent in passing the TCPA. In cases such as this, where the relevant statutory text is ambiguous, we may look to legislative history for further guidance. *See United States v. Blanchard*, 618 F.3d 562, 567 (6th Cir. 2010); *Chrysler Corp. v. Comm'r of Internal Revenue*, 436 F.3d 644, 654 (6th Cir. 2006). Here, it is quite clear that Congress sought only to protect individuals and businesses from the invasions of privacy occasioned by automated and prerecorded calls. *See* 137 Cong. Rec. H11307-01 (daily ed. Nov. 26, 1991) (statement of Rep. Cooper) ("I regard and I hope the FCC will regard, robotic calls by machines such as auto dialers and computer-generated voices to be a much greater threat to the privacy of our homes than calls by live operators."); *see also* 137 Cong. Rec. S18781-02 (daily ed. Nov. 27, 1991) (statement of Sen. Hollings) ("The bill includes provisions to restrict telephone calls that use an automated or computerized voice. These calls are a nuisance and an invasion of our privacy."). Congress drew an explicit distinction between "automated telephone calls that deliver an artificial or prerecorded voice message" on the one hand and "calls placed by 'live' persons" on the other. S. Rep. No. 102-178, at 4-5 (1991), *reprinted in* 1991 U.S.C.C.A.N. 1968, 1972. That distinction makes all the difference in this case. Whereas Congress intended to regulate automated calls playing prerecorded messages, KDMC did not receive any such calls.

Yet what are we to make of KDMC's allegation that its call logs showed a single origin number? Unfortunately for KDMC, it does not alter the most material fact: each time the telephone rang in Jackson's office, it was the result of two separate communications. The first was between the SEIU's automated system and a resident; the second was between the resident and Jackson. These residents were not mere conduits through which the SEIU's automated system contacted KDMC. After all, KDMC notes that it received only 536 calls—even though hundreds more residents heard the SEIU's prerecorded message. The upshot is that residents initiated separate calls to KDMC when they made a conscious decision to manually press "1" on their telephones. If they decided not to press "1," the calls ended and Jackson's telephone never rang. Because live calls from residents rather than automated calls from the SEIU

ultimately engaged hospital lines, the TCPA does not apply and KDMC cannot state a plausible claim that the SEIU "used" its automated system in violation of § 227(b)(1)(D).

To review, bearing in mind that words in a statute take their shape from those around them, we construe the language in § 227(b)(1)(D) to regulate first-order contact between automated or prerecorded calls and multi-line businesses. However, KDMC fails to allege that it received anything other than live calls from real persons. Therefore, KDMC cannot state a claim under the provision in question. A broader reading of the TCPA would fail to respect ordinary principles of statutory construction, would stretch the scope of prohibited conduct beyond reason, and would run contrary to Congress's stated intent in enacting the TCPA.

Put simply, the TCPA is not the appropriate vehicle to regulate the give-and-take of labor disputes such as this. Although there might well be a statute protecting entities like KDMC from the conduct alleged herein, the TCPA is not it.

### III.

In its complaint, KDMC also sought relief on the theory that the automated calls to area residents—i.e., the underlying campaign—violated certain provisions of the TCPA. KDMC alleged that the SEIU made prerecorded calls to residential telephone lines without prior express consent, 47 U.S.C. § 227(b)(1)(B), and that it failed properly to identify itself on those calls, *id.* § 227(d)(3). The district court did not squarely address either claim in ruling on the SEIU's motion to dismiss. And KDMC does not appear to press them on appeal. For this reason, we are likely not in a position to reverse the district court's dismissal on these grounds. *See Turner v. City of Taylor*, 412 F.3d 629, 639 (6th Cir. 2005) (holding that issues raised in the district court but not on appeal are considered abandoned and not reviewable by the appellate court).

Even if we were in such a position, the claims are without merit. Under § 227(b)(1)(B), a person or entity may not "initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the

prior express consent of the called party, unless the call . . . is exempted by rule or order of the [Federal Communications] Commission . . . ." This subsection protects consumers from receiving unsolicited telemarketing calls in their homes. While the robo-call campaign would otherwise constitute an obvious violation of § 227(b)(1)(B), the FCC has exempted calls "made by or on behalf of a tax-exempt nonprofit organization" and calls "not made for a commercial purpose" from the general ban on artificial or prerecorded messages. 47 C.F.R. § 64.1200(a)(3) (2012). The SEIU's status as a tax-exempt labor organization under § 501(c)(5) of the Internal Revenue Code is not in doubt. Nor is it in doubt that the SEIU made its calls for a non-commercial purpose.

Where the TCPA permits certain automated calls, it still prescribes mandatory "technical and procedural standards." *See* 47 U.S.C § 227(d)(1). Among these standards is a disclosure requirement that "all artificial or prerecorded telephone messages shall . . . state clearly the identity of the . . . entity initiating the call, and shall . . . state clearly the telephone number or address of such . . . entity . . . ." *Id.* § 227(d)(3)(A). The relevant portion of the statute lacks an "unless" clause; the plain language of § 227(d) applies the mandatory standards to any call made "using any automatic telephone dialing system." *See Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 413 (D. Md. 2011). On the facts alleged, it is clear that the SEIU failed to include the necessary identifying information in its prerecorded message. However, there is little KDMC can do about it. The private right of action under which KDMC brought this suit, 47 U.S.C. § 227(b)(3), is expressly limited to enforcing the four § 227(b)(1) prohibitions. Section 227(d) does not contain a similar private right of action, unlike other subsections. *Cf. id.* § 227(b)(3) (enforcing the prohibitions on the use of automated telephone equipment); *id.* § 227(c)(5) (enforcing protections for subscriber privacy rights). While § 227(g)(1) does authorize actions to enforce sections of the TCPA that include § 227(d), it does so only for state attorneys general or other public officials. *See id.* § 227(g)(1) (entitled "Authority of States"). Thus, KDMC lacks the authority to sue for any § 227(d)(3)(A) violation even assuming it could demonstrate standing.

IV.

For the foregoing reasons, we affirm the district court's dismissal of the complaint.

———————

## DISSENT

———————

ROSE, District Judge, dissenting. I respectfully dissent. The majority concludes that KDMC's complaint is insufficient because KDMC has not pled plausible violations of § 227(b)(1)(A), § 227(b)(1)(B) or § 227(b)(1)(D). I conclude that KDMC plausibly pled violations of   § 227(b)(1)(A) and § 227(b)(1)(D).

### Section 227(b)(1)(A)

The majority correctly observes that KDMC sought relief on the theory that the automated calls to area residents violated certain provisions of the TCPA. As the majority sets forth, the TCPA makes it unlawful "to make any call… using any automatic telephone dialing system or an artificial or prerecorded voice… to any emergency telephone line… [or] to the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment…." KDMC's complaint alleges that the SEIU made prohibited calls by connecting certain local residents to KDMC CEO Fred Jackson's ("Jackson's") extension at the hospital. Therefore, whether KDMC's complaint is plausible turns on the meaning of "make any call."

The TCPA does not define "call." However, the majority concludes that this term "quite naturally" suggests some kind of direct communication between two parties. Yet, in today's world, and especially in light of the reasons for enactment of the TCPA, a call is not necessarily between two individuals. One of the parties may be an individual and the other party may be a computer or similar device. In this case, KDMC has pled that the calls received by Jackson came from the SEIU's automated system.

The majority emphasizes the fact that, if Jackson had answered his phone, he would have heard a real voice on the other end. However, this section of the TCPA says nothing about hearing a real voice.

The majority then turns to the Ninth Circuit to support its determination of what "make any call" means. In *Satterfield*, the case cited by the majority, the Ninth Circuit determined that sending a "text" satisfied the TCPA prohibition on "making a call." However, the *Satterfield* court was addressing the type of message and not whether the message was communication between two parties or between a computer and an individual.

The majority next finds that KDMC's argument that the SEIU's robo-calling campaign caused the disruptive deluge of live calls to be made to Jackson "stretches credulity for obvious reasons." However, I would disagree.

I conclude that the expression "make any call" would include direct telephone communications between an automated dialing system and an individual. Further, I conclude that KDMC has plausibly pled that the SEIU made calls to KDMC using an automated dialing system. Even though a local citizen may have participated in the call to KDMC by pressing "one," KDMC pleads that the call to it originated with and was connected from SEIU's automated dialing system.

Section 227(b)(1)(B)

Section 227(b)(1)(B) prohibits making prerecorded calls to residential telephone lines without prior express consent, and section 227(d)(3) requires callers making prerecorded calls to residential telephone lines to identify themselves. The majority observes that the district court did not squarely address either claim, that KDMC does not "appear" to press these claims on appeal and the majority is not "likely" in a position to reverse the district court's dismissal on "these" grounds.

The majority finds that KDMC has no private cause of action to enforce section 227(d)(3). With this I agree. State attorney generals or other public officials must enforce this section of the TCPA.

As for the section 227(b)(1)(B) claim, the majority determines that, if it were in a position to adjudicate this claim, it is without merit. I do not agree that the record indicates that this claim is without merit.

The majority concludes that, while the SEIU's robo-calling campaign would otherwise be an obvious violation of section 227(b)(1)(B), the SEIU is exempted. The TCPA gives the FCC authority to exempt calls not made for a commercial purpose and calls made for commercial purposes that (1) will not adversely affect the privacy rights that the TCPA is intended to protect and (2) do not include the transmission of any unsolicited advertisements. 47 U.S.C. § 227(b)(2)(B). Thus, before determining that the SEIU is exempted, a court must first determine if the call was made for a commercial purpose. If the call was not made for a commercial purpose, the FCC exemption could be considered. If the call was made for a commercial purpose, the FCC exemption would not apply. Before concluding that this claim is without merit based upon an exemption for the SEIU, I would remand the matter for a determination of whether the calls were for a commercial purpose and whether the SEIU is entitled to an exemption in this case.

Section 227(b)(1)(D)

Section 227(b)(1)(D) prohibits "us[ing] an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged in simultaneously." Whether KDMC has plausibly pled such a cause of action turns on what it means to "use an automatic dialing system."

Clearly, KDMC has plausibly pled that two or more of its telephone lines were engaged simultaneously by calls that it received as a result of the calls placed by the SEIU to area residents. While the calls to KDMC were not prerecorded messages, KDMC has plausibly pled that they were all received from one SEIU telephone number and were received as a result of the SEIU's robo-calling campaign.

Thus, I think that KDMC has plausibly pled that the SEIU has used an automatic telephone dialing system in such a way that two or more of KDMC's telephone lines were simultaneously engaged. The fact that a "live" person participated in the calls from the SEIU automated system to KDMC is not relevant. Presumably, a live person somewhere, somehow initiates all robo-calls.

Conclusion

I believe that KDMC has plausibly pled that the SEIU has violated sections 227(b)(1)(A) and 227(b)(1)(D) of the TCPA.  I also believe that the district court must address whether the SEIU's robo-calls were for a commercial purpose, and if not, whether the SEIU is entitled to an exemption.  Therefore, I would reverse the district court's dismissal of KDMC's complaint and remand this matter for continued adjudication of KDMC's complaint.